OPINION
Plaintiff-appellant, M. Farid Edwards, M.D., appeals from a judgment of the Franklin County Court of Common Pleas arising from a jury verdict in favor of defendant-appellee, Grant Anesthesia Associates, Inc. ("GAA"). Because the trial court abused its discretion in admitting several exhibits containing prejudicial hearsay, we reverse and remand this matter to the trial court for a new trial.
Plaintiff's appeal arises from a fact-intensive scenario. Plaintiff provided anesthesia services at the Grant Medical Center ("Grant") from 1974 to October 4, 1995, as a sole practitioner and as a member of several groups.
In 1992, Grant decided the anesthesiologists providing services at the hospital should form one group. The group would be responsible for scheduling, providing, and billing all anesthesia services at Grant pursuant to an exclusive three-year contract. Grant invited contract proposals, but imposed several conditions. One condition required that all anesthesiologists currently practicing at Grant be invited to join the group whose proposal was accepted.
Various proposals were submitted. Drs. Jon Preston and James Highley presented a proposal on behalf of GAA. Dr. Edwards also presented a proposal. Grant awarded the exclusive contract to GAA, and, as required, GAA included Dr. Edwards in its group.
Dr. Edwards was a shareholder and employee of GAA, was elected to a term as a corporate officer, and signed a "shareholder employment agreement" that provided for termination of employment "with cause" or "without cause." Under section 9(a) of the agreement, termination by GAA "without cause" required ninety days' notice and a majority vote of two-thirds of the board of directors. Termination by GAA "with cause" under section 9(b) required a vote by a simple majority of the board of directors upon the occurrence of listed events, including disqualification to practice medicine, conviction of a felony, mental or physical incapacity, gross incompetence, gross negligence, willful misconduct, and material breach of a material term of the contract. The contract also included a non-competition clause.
In 1993, Dr. Robert Zimmerman applied to join GAA in order to work at Grant as an anesthesiologist. As a condition of being permitted to join, GAA required Dr. Zimmerman to pay back funds he had received pursuant to a settlement agreement that concluded litigation between GAA and Dr. Zimmerman's former group at Grant. In compliance with the condition, Dr. Zimmerman endorsed a check to GAA. The president of GAA, Dr. Sambit Barua, then endorsed the check to Dr. Preston, a member of GAA, who split the funds with Dr. Highley.
In 1993, Dr. Thomas Mallory, an orthopedic surgeon, approached Dr. Edwards about the possibility of retaining anesthesiologists to provide anesthesia services exclusively for his surgical group at Grant, Joint Implant Surgeons ("JIS"). Dr. Edwards responded to the inquiry with an outline of costs that showed the idea was not feasible.
In June 1993, seven members of GAA wrote a letter to Grant recommending Dr. Highley for appointment as medical director of anesthesiology at Grant. Dr. Edwards declined to sign the letter.
In January 1994, at a GAA shareholders meeting, a discussion was held about Dr. Edwards' contact with Dr. Mallory. The minutes included the following statements:
 Discuss/Recommend It was noted that Dr. Edwards had been approached and entered into a discussion as to the possibility of him individually providing anesthesia services for JIS. According to the GAA contract, this "negotiation" is a clear breech [sic] of contract, under the "direct competition clause."
 Conclusion/Action Dr. Edwards was requested to have no further negotiations or discussions concerning this issue, with any such report to be dealt with by the corporation. (Defendant Exhibit 10.)
On January 7, 1994, Dr. Highley sent a letter to Dr. Edwards stating that his "conversations/negotiations with JIS" were a violation of his employment agreement and warning him that "[a]ny further action on this matter will rest with the shareholders of GAA and will be at there [sic] discretion." (Defendant Exhibit 11.)
In February 1994, Dr. Edwards wrote a letter to a Grant administrator, Dr. Nobrega, complaining about a proposed plan that would allow GAA to begin assigning major vascular surgeries to certain anesthesiologists. Dr. Nobrega wrote to GAA that the matter should be handled internally, and he also responded to Dr. Edwards. Dr. Highley then wrote a letter to all GAA members stating that Dr. Edwards, in taking his complaint outside the group, placed their shareholder assets at risk and acted contrary to his fiduciary responsibility to the corporation. Dr. Highley commented that there had been no effort to "separate" the vascular work "as occurred with JIS." (Defendant Exhibit 16.)
In April 1995, Dr. Edwards submitted a request to reduce his hours and compensation under GAA's provision for part-time employment. GAA denied his request, as it denied a similar request by Dr. Karen Logan.
At some point, no later than 1995, Dr. Edwards learned how Dr. Zimmerman's check to GAA had been distributed. He obtained a copy of it and wrote to GAA's treasurer, noting that the check did not appear to have been deposited in a GAA account. He suggested that if the funds were not deposited to a GAA account, there should be an investigation into the possibility of embezzlement. Dr. Logan, the treasurer, responded that the president had approved the payment to Dr. Preston pursuant to a legal arbitration. Dr. Edwards, however, believed the statement was incorrect. He understood Dr. Barua to have said that Dr. Preston instructed Dr. Barua give him the check, and that Dr. Barua himself did not know why the check was given to Dr. Preston personally. In August 1995, Dr. Edwards wrote to Dr. Logan, asking for copies of the agreement under which Dr. Zimmerman paid money to join GAA. He also requested documents relating to the arbitration agreement requiring or permitting GAA to give the funds to Dr. Preston.
The minutes of the August 16, 1995 meeting of the GAA Executive Committee, at which Dr. Edwards was not present, include an explanation of the transactions involving the Zimmerman funds, refuting the suggestion of embezzlement. Signed by Dr. Preston as then current president, the minutes included the following statements:
 Additionally, last year Dr. Edwards was sanctioned for his breach of a contract [for] negotiations with Dr. Mallory to take on his anesthesia as a private contractor. Recently, it was learned that once again, he has been in discussion with Dr. Mallory to take not just JIS anesthesia but all of the Ortho Center's anesthesia.
* * *
 Also discussed were the past incidents in which Dr. Edwards reported corporation business to the hospital administration and spread corporation discussion and personal opinion of same to the surgeons. (Defendant Exhibit 44.)
On August 16, 1995, Dr. Highley wrote a letter to all GAA shareholders stating why he and Dr. Preston were entitled to receive the Zimmerman funds. He concluded his letter with the following paragraph:
 * * * In my opinion, Dr. Edwards has never had the best interest of GAA at heart. (See letter of June 8, 1993 and note the [sic] Dr. Edwards is the only person not signing.) From day one, he presented a competing proposal to the hospital for the contract for anesthesia services at Grant Medical Center (a proposal which would have made each of us his employee). There was also his admitted effort to break a portion of GAAs [sic] business off for himself by stealing JIS from under GAAs [sic] nose. Dr. Edwards' most recent effort is, I believe, perfectly consistent with his long past history of subversive behavior in GAA. I consider his actions disruptive to the Department and, as such, an ongoing threat to patient care. (Defendant Exhibit 45.)
On October 4, 1995, GAA held a shareholders meeting. The minutes of the meeting, signed by Dr. Preston as president, stated:
 Dr. Edwards was charged with being disruptive to the Department, disruptive to the schedule, a rudimental cause of Departmental disruption, divulging proprietary corporate information, willfull [sic] misconduct.
Background for consternation:
 1 1/2 years ago Dr. Edwards had admitted plans with JIS to take over the anesthesia for its cases. He is accused of reopening these areas with Dr. Mallory. Dr. Edwards denied this, but offered a letter from Dr. Mallory saying that Dr. Edwards did not solicit this business endeavor. On the other hand, in a recent meeting, Dr. Mallory stated that, in fact, he and Dr. Edwards had been talking and had discussed doing all the anesthesia in the Orthopedic Surgery Center. They had reviewed figures and found just breaking JIS off would not be economically feasible, but doing all the ortho cases would.
A few other instances citing Dr. Edwards' involvement included:
 Lack of input at meetings, but constant "stirring" out of meetings with surgeons as well as GAA members; divulging corporate business to surgeons; sharing corporate economic figures with Dr. Mallory; unwillingness to sign corporate documents.
 GAA currently finds itself in a "de facto" competition at JIS, as a result of Dr. Edwards' behavior. Administration has been involved in some of this activity, as Dr. Mallory has been unhappy with the present situation. With the volume he generates in the hospital, he might insist that Administration change the exclusive anesthesia contract to exclude the ortho center. In addition, the inter-corporate disruption has jeopardized GAA's contract with the hospital.
 A complete lack of confidence was voiced by several members of the corporation. They no longer wished to continue the frustration and corporate disruption continually caused by Dr. Edwards. Other members voiced concern over the possible breach of fiduciary responsibility on Dr. Edwards' part. Yet, there was conflict in what to believe due to the difference in Dr. Edward's claim that he hadn't entered into any discussions with Dr. Mallory since his year and a half ago discussions and reports that Dr. Mallory stated he had been talking with Dr. Edwards.
 Pulling the orthopedic anesthesia away from GAA would be a violation of Dr. Edwards' GAA contract.
* * *
 This discussion/plan is a breach of Dr. Edwards' contract with GAA and grounds for termination. (Defendant Exhibit 51.)
The minutes indicate a motion was made that Dr. Edwards be "removed from the corporation effective this evening" due to "his misconduct and a lack of confidence in Dr. Edwards as a business and professional partner." The shareholders voted, and the motion passed by a vote of seven to six.
Dr. Edwards left the meeting, as his employment had been terminated. Following his departure, the discussion continued. The minutes indicate a question was raised over the definition of "for cause," and whether all shareholders had to be polled regarding a "with cause" termination, as one member was absent. According to the minutes, it was agreed that a legal opinion "of the circumstances and contract wording" would be sought. However, the minutes further state that Dr. Highley "announced that Dr. Edwards would be excluded from the OR schedule pending further examination of this issue." After October 4, 1995, Dr. Edwards was excluded from working at Grant, and he never returned to his work at Grant.
The GAA board of directors met on October 25, 1995. The minutes of that meeting state that at the October 4, 1995 meeting the shareholders had only "considered" removing Dr. Edwards from the corporation. Accordingly, on October 25 the board of directors voted to "suspend Dr. Edwards with $250.00 week pay * * * effective 10-26-95." (Defendant Exhibit 52.) Drs. Preston and Highley notified Dr. Edwards by letter of the suspension, reduction in pay, and requirement that he participate in an investigation by appearing to answer questions.
On November 1, 1995, Dr. Edwards appeared as required and answered written interrogatories. In his answers, Dr. Edwards explained that after his employment was terminated on October 4, 1995, he spoke with an attorney who advised him that (1) GAA had breached the employment contract in its termination procedures, and (2) the non-competition clause was no longer binding. Thus, he started looking for work immediately. He explained that he called JIS and told them he was available, but then left on vacation. JIS did not respond to indicate whether it was interested. Dr. Edwards denied any agreement with the JIS physicians, and denied recruiting members to break away from GAA. Regarding discussions with Dr. Mallory, he explained those happened in 1993 and he gave details.
On November 6, 1995, Dr. Edwards wrote to Grant's president, asking that his hospital privileges not be revoked on the basis of the GAA termination until he was afforded a hearing by Grant.
On Wednesday, November 15, 1995, GAA held a board of directors' meeting which Dr. Edwards attended. The minutes, signed by Dr. Preston as president, stated:
 In 1993 Dr. Edwards participated in discussions with JIS regarding breaking the JIS and Orthopedic Center anesthesia away from GAA and providing private anesthesia services. He was formally warned this discussion was willful misconduct, a breach of his fiduciary duty to the corp. and a material breach of his contract.
 In 1995 Dr. Edwards once again participated in discussions with JIS regarding breaking the JIS and Orthopedic Center anesthesia away from GAA. He did not notify GAA of these discussion[s] and disclosed and utilized confidential corporate information to outside sources. This constitutes willful misconduct, breach of fiduciary responsibility and a material breach of his employment agreement.
 The Questionnaire Supplemental Questionnaire Dr. Edwards was subsequently asked to complete in connection with the investigation was not answered completely or honestly. This constitutes willful misconduct, breach of fiduciary duty and a material breach of his employment agreement.
 Dr. Edwards has failed to comply with the bylaws, rules regulations of the corp. and the dept. including failure to participate in all call schedules and disclosing confidential information of the corp. This constitutes willful misconduct. (Defendant Exhibit 61.)
The minutes state that the following actions were taken:
 RECOMMENDATION: Due to this willful misconduct, breach of material fiduciary duty and breach of material terms of his employment contract, the Board of Directors should vote to authorize the termination of Dr. Edwards' employment for cause pursuant to Section 9(b) of his Employment Contract.
Dr. Edwards was then asked to leave the meeting. According to the minutes, a motion was made to terminate Dr. Edwards' employment "for cause." The motion was approved by a vote of eight to six.
According to the trial testimony, some GAA members were concerned about Dr. Edwards and his family losing their income and health insurance so abruptly, and felt that GAA should continue him on the payroll for a time while he looked for other employment. They were also concerned about the effect of a "for cause" termination on his professional reputation. According to the meeting minutes, it was suggested that the board of directors consider terminating Dr. Edwards' employment "without cause," but then extend him an offer to continue with GAA as a part-time employee. A motion to that effect was made and passed.
On November 16, 1995, GAA sent Dr. Edwards a letter notifying him that the board voted to terminate his employment "without cause" and to extend him an offer of part-time employment. The offer of part-time employment expired, and on November 21, 1995, GAA gave Dr. Edwards notice under the contract that his employment would terminate effective February 19, 1996. The letter stated that the suspension would remain in effect until that date.
Dr. Edwards applied for employment at hospitals and surgical centers in central Ohio. In early January 1996, GAA instructed Dr. Edwards to appear for further questioning. GAA had learned Dr. Edwards contacted the attorney for Bob Henry, a former GAA employee who was suing GAA for wrongful discharge. Dr. Edwards refused to participate in further investigation, and on January 10, 1996, he filed this action in the Franklin County Common Pleas Court against GAA.
On January 17, 1996, GAA held a "corporate meeting." The minutes describe the following discussion:
 On Monday afternoon (1-15), GAAs attorneys received notification of a law suit that had been filed by Dr. Edwards against GAA. The lawsuit is asking for the payment of his full salary for the 90 day period preceding his termination date, his deferred compensation * * * and release from his no compete clause * * *.
 During the past several weeks it was reported that Dr. Edwards had spoken with hospital administration and surgeons regarding the break off of JIS anesthesia from GAA and initiated a discussion with Bob Henry's attorney (per letter dated 12-20-95 in which he gave detrimental and erroneous information about GAA. (Defendant Exhibit 78.)
A motion was passed to terminate Dr. Edwards' employment "with cause" effective immediately. GAA notified Dr. Edwards of his termination "with cause."
The action Dr. Edwards brought against GAA, seeking a declaration that the termination was in violation of his contract with GAA, proceeded to trial. The trial court, however, granted Dr. Edwards' request for a mistrial.
The action was tried a second time. Dr. Edwards moved to preclude GAA from relying on hearsay evidence in its opening statement. Specifically, he sought to have the hearsay portions redacted from the enlarged copies of the October 4, 1995 minutes that would be shown to the jury. He also objected to the use of an enlarged copy of Dr. Highley's July 1995 memorandum, which related statements that Dr. Mallory allegedly made during a meeting. Dr. Edwards further objected to the use of numerous other exhibits defendant used during its opening statement.
The trial court ultimately ruled that because opening statements are not evidence, it would permit GAA to refer to the documents and show them to the jury. Nonetheless, the court warned GAA it was proceeding at its own risk in relying on evidence during opening statement that might not be admitted during trial. In doing so, the court identified portions of the October 4, 1995 minutes the court found to constitute "hearsay within hearsay" that would be inadmissible unless GAA developed an exception to the hearsay rule during the course of trial. Following the opening statements, Dr. Edwards moved for a mistrial based on the statements GAA made during its opening statement.
The case ultimately was submitted to the jury, which entered a verdict for GAA. The trial court entered judgment on the verdict, and Dr. Edwards appeals, assigning the following errors:
 I. THE TRIAL COURT ABUSED ITS DISCRETION IN OVERRULING APPELLANT'S MOTION FOR MISTRIAL FOLLOWING APPELLEE'S OPENING STATEMENT.
 II. APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO THE CUMULATIVE EFFECT OF MULTIPLE VIOLATIONS OF THE RULES OF EVIDENCE DURING TRIAL.
Dr. Edwards' two assignments of error involve overlapping evidentiary matters; thus we address them jointly. Primarily, they assert the trial court erred in admitting issues involving documentary exhibits that contained hearsay and in allowing hearsay during GAA's opening statement.
 A. Prejudicial Hearsay
While Dr. Edwards raises a plethora of instances of alleged error in the admission of hearsay, two instances require reversal.
Hearsay is a "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A statement is an "oral or written assertion." Evid.R. 801(A)(1). The hearsay rule prohibits the admission of hearsay evidence unless one of the enumerated exceptions is satisfied. Evid.R. 802.
The admission of evidence lies within the discretion of the trial court, and the court of appeals may reverse only upon a showing of an abuse of discretion. Robinson-Lloyds, Ltd. v. Deptof Liquor Control (1952), 91 Ohio App. 521. Similarly, the granting of a motion for mistrial lies within the trial court's discretion, and is reversed only for an abuse of that discretion.Cummings v. B.F. Goodrich Co. (1993), 86 Ohio App.3d 176, 188.
We initially address a memorandum dated July 7, 1995, from Dr. Highley to his file regarding a meeting with Dr. Mallory. According to testimony at trial, Dr. Mallory approached Dr. Highley regarding Dr. Mallory's desire for JIS to have its own anesthesiologists, and Dr. Highley agreed to meet with him. Following the meeting, Dr. Highley wrote the following memorandum describing what Dr. Mallory said:
 * * * During the course of this meeting Dr. Mallory acknowledged that Dr. Edwards and he had, once again, been talking about a separate anesthesia group for JIS and Ortho Center patients. He stated that previous discussions with Dr. Edwards had showed it would not be economically feasible to have a separate anesthesia group for just JIS patients.
 They had been considering, and felt it would be economically feasible, to break JIS and the entire Ortho Surgical Center away from the present anesthesia group and maintain a separate anesthesia group for this surgical center. (Defendant Exhibit 35.)
The memorandum itself is hearsay: it is Dr. Highley's out-of-court statement, offered as a truthful report of what was said at a meeting. To the extent GAA contends the memorandum is admissible under the hearsay exception set forth in Evid.R. 803(6) for business records, application of that exception is subject to some question because a special memorandum of that kind arguably is not a record of a "regularly conducted activity," or because "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." See McCormick v.Mirrored Image, Inc. (1982), 7 Ohio App.3d 232; State v. Lane
(1995), 108 Ohio App.3d 477. Nonetheless, assuming, without deciding, that the memorandum was a business record, the document itself contains further hearsay consisting of Dr. Mallory's alleged statements.
To establish that GAA's actions against Dr. Edwards on October 4, 1995, and on later dates, were within its contractual rights, GAA sought to establish repeatedly that Dr. Mallory and Dr. Edwards resumed negotiations harmful to GAA's interests. Dr. Mallory, however, never testified in court under oath and was not subject to cross-examination. Rather, Dr. Mallory's statements were admitted into evidence through the written characterization composed by GAA's representative, Dr. Highley.
Dr. Mallory's statements reported in the July 1995 memorandum were hearsay for which defendant has articulated no convincing exception. See Bank One Securities Corp. v. Jaworowski
(May 31, 1996), Montgomery App. No. 15641, unreported. They were out-of-court statements offered to prove that Dr. Mallory and Dr. Edwards resumed talks about starting a separate anesthesia group, and that the talks involved taking not only the JIS business away from GAA but also the Ortho Surgical Center business as well. Although the memorandum may be relevant to the issues at trial, the document presents Dr. Highley's characterization of what Dr. Mallory said, and it is inadmissible hearsay. Bank One Securities,supra; Cox v. Oliver Machinery Co. (May 11, 1987), Butler App. No. CA86-02-031, unreported. Moreover, because Dr. Edwards' purported discussions with Dr. Mallory were a premise for GAA's concluding that Dr. Edwards breached his contract with GAA, the evidence was highly prejudicial. The admission of the exhibit into evidence, and its presentation to the jury in opening statement, were beyond the trial court's discretion.
Secondly, we address a letter dated December 29, 1993, from Dr. Highley, enclosing a December 27, 1993 memorandum by Dr. Getz, admitted as Defendant's Exhibit 7 and boarded for the jury during opening statement. Dr. Highley's letter to Dr. Edwards states, in part:
 Dr. Romanelli has forwarded a complaint to me regarding failure on your part to follow our agreed upon system of case assignments and "out system." The event occurred on December 27, 1993. A copy of a letter from Dr. Getz accompanies this letter.
The memorandum from Dr. Getz was a report to Dr. Highley regarding an oral communication he received from Dr. Romanelli about an experience at the hospital:
 This is to inform you that Dr. Edwards left the hospital [at] approximately 12:30 pm today.
 Dr. Romanelli, first call physician, requested he relieve Dr. Zimmerman about this time. Dr. Edwards stated that he was too tired from holiday travel and left the hospital.
This action usurps the out plan that we have adopted.
This exhibit consists of an out-of-court statement by Dr. Highley, accompanied by an out-of-court statement by Dr. Getz. Most importantly, the exhibit includes an out-of-court statement allegedly made by Dr. Romanelli accusing Dr. Edwards of violating a GAA rule.
Even though GAA stated in its opening that Dr. Romanelli would testify, Dr. Romanelli never testified during the trial. Thus, the trial court not only allowed the jury to hear, but subsequently admitted, Dr. Romanelli's testimony, unsworn and not subject to cross-examination. Dr. Romanelli's out-of-court statements constituted hearsay on a crucial issue, Dr. Edwards' alleged misconduct. Moreover, we find unpersuasive GAA's argument that it offered the exhibit not for the truth of the statements in it, but merely to show how Dr. Edwards reacted whenever a complaint was levied against him. The admission of the document into evidence was an abuse of discretion.
Based on the abuse of discretion in admitting these two highly prejudicial exhibits into evidence, the judgment of the trial court must be reversed. Many of the remaining issues and arguments are thereby rendered moot. Nonetheless, because this cause is being remanded for a new trial, we comment on some of those matters.
 B. Additional Matters
Initially, we address the March 18, 1994 letter from Dr. Logan to Dr. Barua, complaining that Dr. Edwards' communication with Grant's administration had no purpose except, "once again, to undermine the integrity and harmony" of GAA. (Defendant Exhibit 18.) Dr. Logan accused Dr. Edwards of "insubordination" and "ceaseless efforts to disrupt the reputation of our group and to put us all in jeopardy for future contract considerations," and requested action against Dr. Edwards under the GAA bylaws. (Id.) The letter, with its vivid testimonial accusations against Dr. Edwards, was presented to the jury during opening statement, even though Dr. Logan never testified in court under oath and subject to cross-examination.
GAA contends the letter was within the business records exception of Evid.R. 803(6), because the document was placed in the regular corporate records for filing. Even if the letter may be admissible strictly to show a complaint was received, it is not admissible to prove the truth of the statements made in it. Babbv. Ford Motor Co., Inc. (1987), 41 Ohio App.3d 174. Inserting the letter into GAA's files does not convert otherwise inadmissible hearsay into an exception under Evid.R. 803(6). State v. Barron
(June 8, 2000), Franklin App. No. 99AP-59, unreported, citingBabb, supra.
Rather, to admit such accusations for their truth, defendant should have required Dr. Logan to appear in court to make the statements under oath, subject to cross-examination and jury observation. Our determination that the exhibit contains inadmissible hearsay does not in any way impugn the trustworthiness of Dr. Logan. Rather, "the circumstances of preparation" lack the particular indicia of trustworthiness that permit a hearsay exception for a business's records of its "regularly conducted activities." Evid.R. 803(6).
The record is not entirely clear whether the exhibit was admitted. At one point, the trial court plainly admitted the exhibit. Later, the court stated it was "reserving" judgment on that exhibit and others until the next day, but no subsequent ruling appears in the transcript. Nonetheless, to the extent the exhibit was admitted, admission was improper and an abuse of discretion. If the document was not admitted, permitting GAA's reading it to the jury in the opening statement prejudiced plaintiff. Given the cumulative nature of the hearsay presented during opening statement, coupled with the highly prejudicial nature of this hearsay, the trial court's cautionary instruction that opening statements are not evidence was insufficient to overcome the prejudice to Dr. Edwards.
Further, regarding the cumulative nature of the hearsay presented to the jury during the opening statement, GAA made the following assertions during its opening:
 However, within 48 hours of this meeting [on October 4, 1995, when Dr. Edwards was excluded from the operating rooms] Dr. Edwards spoke to Dr. Lombardi. * * * He is a partner of Dr. Mallory of Joint Implant. Within two days of this meeting Dr. Edwards, the evidence will show, spoke to Dr. Lombardi telling him about the meeting events and saying that he was ready to come to work for Joint Implant.
 Dr. Lombardi and Dr. Mallory both knew they were in the thick of it in regard to Dr. Edwards' problems with GAA that they wanted to become uninvolved.
 Dr. Romanelli — I mentioned his name earlier — will come in to testify that he was confronted by Dr. Lombardi in the hospital on October 26, 1995, and told that he and Dr. Mallory would deny ever having communications with Dr. Edwards if they were asked to tell the truth about it. * * *
 Doctor Highley did a memo when Dr. Romanelli told him about Dr. Lombardi's confrontation with him in the hallway. * * * (Tr. 99-100.)
During the trial, however, neither Dr. Romanelli nor Dr. Lombardi testified. Moreover, GAA withdrew the Highley memorandum (Defendant Exhibit 53), and it is not part of the record. Yet the purported statements of both Dr. Lombardi and Dr. Romanelli were presented to the jury, which also heard about Dr. Highley's corroborative memorandum that never was admitted into evidence. Those statements during the opening, not supported with the evidence, were highly prejudicial.
Dr. Edwards further complains about two letters that he wrote, one to Dr. Nobrega about the vascular surgery issue and the other to Dr. Preston regarding part-time work. The letters are not hearsay because they are Dr. Edwards' own statements offered against him by GAA. See Evid.R. 801(D)(2)(a). The responses to those letters were hearsay. Both were relevant, in that Dr. Nobrega's letter could tend to show harm to GAA, and Dr. Preston's refusal of the part-time request could tend to show motive for harming GAA. While neither may be extremely prejudicial and, considered alone, would not require reversal of the trial court's judgment, the admission of those letters contributed to the overall prejudicial effect of the hearsay presented to the jury. In particular, Dr. Nobrega's letter to GAA was subject to almost unfettered interpretation because he never gave live testimony regarding his reaction to Dr. Edwards' communication and whether it negatively affected Grant's contractual relationship with GAA.
We also address the minutes of the shareholders' meeting on October 4, 1995, Defendant Exhibit 51. The minutes include GAA's statements of what Dr. Edwards had allegedly stated on a previous occasion and statements made by unidentified persons at the meeting. These out-of-court statements include alleged admissions by Dr. Edwards and accusations against Dr. Edwards:
 1 1/2 years ago Dr. Edwards had admitted plans with JIS to take over the anesthesia for its cases. He is accused of reopening these areas with Dr. Mallory. * * * [I]n a recent meeting, Dr. Mallory stated that, in fact, he and Dr. Edwards had been talking and had discussed doing all
the anesthesia in the Orthopedic Surgery Center. They had reviewed figures and found just breaking JIS off would not be economically feasible, but doing all the ortho cases would.
* * *
 A complete lack of confidence was voiced by several members of the corporation. They no longer wished to continue the frustration and corporate disruption continually caused by Dr. Edwards. Other members voiced concern over the possible breach of fiduciary responsibility on Dr. Edwards' part. * * * [There were] reports that Dr. Mallory stated he had been talking with Dr. Edwards.
Even if GAA's minutes are a business record of the corporation and are admissible in part for some purposes, not all contents of the document are excepted from the hearsay rule. Evid.R. 805. The noted passages are highly prejudicial characterizations of statements made by Dr. Mallory and unidentified GAA shareholders. Indeed, the trial court explicitly identified portions of the October 4, 1995 minutes that were "hearsay within hearsay" and thus inadmissible unless GAA developed an exception to the hearsay rule during the course of the trial. The transcript, however, does not demonstrate that GAA did so, but the transcript also shows that, despite numerous objections before and during trial to the hearsay portions of this document, Dr. Edwards waived those objections before closing and explicitly voiced "no objection" to the admission of this exhibit. Dr. Edwards' waiver not only precluded argument from GAA at trial in favor of admission, but precludes a finding of reversible error in the admission of Defendant Exhibit 51.
Nonetheless, as noted, we sustain Dr. Edwards' two assignments of error to the extent indicated. Accordingly, the judgment of the trial court is reversed, and this matter is remanded to the trial court for further proceedings consistent with this opinion.
BROWN and PETREE, JJ., concur.